Mortgage Building and Loan Association Case.

82

Argued (Appeal, No. 335, submitted) January 25, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

84

*Sylvan H. Hirsch,* with him *Herbert P. Sundheim,* Special Deputy Attorneys General, and *Claude T. Reno,* Attorney General, for appellant, Nos. 333-335 and 369-410, and for appellee, Nos. 192, 255, 321, 330, 337, 338 and 359.

*Frank J. Eustace, Jr.,* for appellant, No. 321, and for appellee, Nos. 330, 337, 338 and 369-410.

*Joseph H. Sundheim,* for appellant, Nos. 192, 255 and 359, and for appellee, Nos. 337, 338 and 369-410.

*Joseph P. Gaffney,* with him *Joseph P. Gaffney, Jr.,* for appellant, No. 330, and for appellee, Nos. 337 and 338.

*Edgar S. McKaig,* with him *John Stokes Adams,* of *Adams, Childs, McKaig & Lukens,* for appellant, No. 338.

*Isaac Hassler,* in propria persona, appellant, No. 337, and for appellee, Nos. 192, 359 and 369-410.

*William R. Bready, 3rd,* with him *Albert W. Sanson,* for appellee, Nos. 369-410.

*Charles J. Biddle,* with him *Albert M. Hoyt, Jr.,* for appellee, Nos. 333, 334 and 335.

*Nathan Silberstein,* with him *Abraham L. Freedman, Wolf, Block, Schorr & Solis-Cohen, Charles J. Weiss, Sabato M. Bendiner* and *Milford Bendiner,* for appellees, Nos. 374, 392, 393, 398, 399, 400, 403, 404 and 408.

*Andrew R. McCown,* with him *John Randolph Young,* and *Shields, Clark, Brown & McCown,* for appellee, Nos. 321, 330, 333-335, 337, 338, 369-410.

*Joseph First, J. Pennington Straus* and *Murdoch, Paxson, Kalish & Green,* for appellee, Nos. 330, 335 and 369-410.

*Louis DuHadway,* for appellee, Nos. 337 and 338.

*William C. Hayes, Marshall H. Morgan, Harry Polish, Joseph B. Winokur, Henry Arnold Weiss, Wessel, Bennett & Weiss, Frank E. Gordon, J. Siegmund Levin, Malvin H. Reinheimer, Max Walls, D. Byrne Flynn, Herbert A. Barton, Winfield W. Crawford, Sigmund H. Steinberg, Meyer Kraus, Fred C. Gartner, Herbert Welty, Aaron Cohen* and *Leon Cohen,* for appellees, Nos. 369-410.

*Minnie Friedman* and *Tessie Friedman,* in propriis personis, appellees, Nos. 369-410.

OPINION BY MR. JUSTICE LINN, March 22, 1939:

These appeals[1] are from the adjudication made on the audit of the First and Partial Account of the Secretary of Banking as Receiver of Mortgage Building and Loan Association.

This association—hereafter called the New corporation—was created by merger pursuant to the Act[2] of May 3, 1909, P. L. 408, 15 PS section 421 et seq., as amended. The corporations merged into the New corporation were (1) the Mortgage Building and Loan Association—hereafter called the Old Mortgage Association, (2) Academy Building & Loan Association—hereafter called Academy, (3) Gerson Dannenberg Building & Loan Association—hereafter called Dannenberg, (4)

---

[1] 51 in number.

[2] Since this action was taken, merger of Building and Loan Associations has been provided for by the Building and Loan Code of 1933, P. L. 457, sec. 1001, et seq., P. L. 514, 15 PS sec. 1074-1001 et seq. as amended.

Handel and Haydn Building & Loan Association—hereafter called Handel, (5) Hoover Building & Loan Association—hereafter called Hoover, (6) Realty Building & Loan Association—hereafter called Realty, (7) Shareholders Building & Loan Association—hereafter called Shareholders Association.

The merger took place April 7, 1931, and produced a solvent corporation.[3] It carried on the business for which it was incorporated until February 9, 1933, when receivers were appointed in the federal court for the Eastern District of Pennsylvania. On February 17, 1933, the Secretary of Banking filed a certificate[4] of possession. The conflict of jurisdiction, resulting from the proceeding in the federal court and the action of the Secretary under the state law, was resolved in favor of the Secretary,[5] whereupon, March 28, 1935, he took physical possession; the rights of the parties were however fixed as of February 9, 1933, when the receivers were appointed by the federal court.[6] The fund[7] for distribution was produced by liquidation of the New corporation. In this First and Partial Account, the Secretary, for purposes of distribution, divided certain claimants into two classes, placing in the first class, creditors who had never been shareholders and, in the second class, those presenting claims based on former stock owner-

---

[3] See *Nice Ball Bearing Co. v. Mortgage B. & L. Assn.*, 310 Pa. 560, 166 A. 239; *Williams v. Wenger*, 319 Pa. 73, 75, 179 A. 242.

[4] See sections 21 and 22 of the Act of June 15, 1923, P. L. 809, as amended, 7 PS sections 21 and 22, since superseded by the Department of Banking Code of 1933, P. L. 565, 71 PS section 733-1 et seq.

[5] *Pennsylvania v. Williams*, 294 U. S. 176.

[6] *United Security Trust Company Case*, 321 Pa. 276, 284, 184, A. 106.; *Emlen's Estate*, 333 Pa. 238.

[7] In his adjudication, LAMBERTON, J., said, "The assets of the New Mortgage Association will probably not be sufficient to pay creditors one hundred cents on the dollar."

ship in constituents and shareholders in the New corporation. This order of payment was challenged by interested parties. After hearing, the learned court below adopted a different classification of creditors, as appears by the final decree in the reporter's statement of the case; distribution, after allowances not now challenged, was directed in the following order: 3. To Philadelphia Saving Fund Society, as an administration expense; 4. to the Nice Ball Bearing Company, a judgment creditor; 5, 6 and 7, to certain claimants and nonassenting stockholders who were allowed the status of general creditors.

No one denies that claims generally described as those owing to public authorities and the necessary liquidation expenses must be paid first, and that general creditors should be paid next; the parties differ in defining creditors, the difference apparently resulting from divergent views of the effect of the merger legislation when resorted to by the building associations.[8]

When a building association becomes insolvent it may have creditors for money loaned (or on other accounts) who have never been shareholders in the association; and it may also have creditors who were shareholders, for example, withdrawing stockholders who have not yet been paid. In the liquidation, the creditors who have been shareholders are placed, because of the partnership characteristics of such shareholding, in a different class from the creditors who have never been stockholders, and are therefore not entitled to take anything until the general creditors are paid. So much will perhaps not be questioned. The same order of payment applies in the liquidation of an association created by merger. Such a corporation may have creditors who were not creditors

---

[8] The subsequently enacted Department of Banking Code of 1933, P. L. 565, 71 PS section 733 et seq. does not govern the priorities in this case; such rights have been fixed as of the date of the receivership.

for money loaned to it, but for obligations imposed upon it as the result of resorting to the merger legislation to obtain its charter. Counsel for the receiver proposed that shareholders in constituent corporations who refused to become shareholders in the New corporation, and so became its creditors, should be called shareholder creditors of the New corporation. The description is not important; the fact is that they never were shareholders in and sustained no shareholder relation to the New corporation; in consequence of the merger they became creditors by operation of law. Only a corporation created by merger or consolidation can have this class of creditors.

Merger is the voluntary act of the shareholders of two or more corporations and binds only those who join, whether expressly or by implication; it brings into existence a new corporation and destroys the constituent corporations except to the extent and for the purposes reserved in the statute.[9] Those who decline to become

---

[9] Sections 1 and 2 of the Act of 1909, P. L. 408, 15 PS sections 421, 422, since supplied by the Building & Loan Code of 1933, P. L. 457, 15 PS section 1074-1001, et seq., under which the New corporation was formed, prescribed the method. Section 3, as amended by Act of April 29, 1915, P. L. 205, 15 PS section 423, provides that ". . . and upon the issuing of new letters patent thereon by the Governor, the said merger shall be deemed to have taken place, and the said corporations to be one corporation under the name adopted in and by said agreement, possessing all the rights, privileges, and franchises theretofore vested in each of them; and all the estate and property, real and personal, and rights of action, of each of said corporations, shall be deemed and taken to be transferred to and vested in the said new corporation, without any further act or deed: Provided, That all rights of creditors and all liens upon the property of each of said corporations shall continue unimpaired, limited in lien to the property affected by such liens at the time of the creation of the same, and the respective constituent corporations may be deemed to be in existence to preserve the same; and all debts not of record, duties, and liabilities of each of said constituent corporations shall thenceforth attach to the said new corporation, and may be enforced

shareholders in the new corporation may demand and receive from it the value of their shares in the constituent corporation as of the date of the merger. The law on the subject is well settled.[10]

The record refers to such shareholders as dissenting or nonassenting; it is not necessary for present purposes to attempt to distinguish between them. They have never been shareholders in the New corporation. The law provides that they shall be paid the value of their interests in the property transferred. Never having been shareholders in the New corporation, the partnership doctrine which subordinates the claims of shareholders in a given association to that of its general creditors has no application; having had their property taken against objection, the New corporation, which took it, must pay for it; they became its general creditors by operation of the law pursuant to which the merger took place. Being general creditors, they, of course, share *pari passu* with the other general creditors of the New corporation, because the law has made no distinction in the priorities of payment demandable by general creditors of a constituent, subject to whose unsecured debts the merger took place, and those who, after merger, became general creditors of the New corporation.[11]

---

against it to the same extent and by the same process as if said debts, duties, and liabilities had been contracted by it." See *Fidelity & Cas. Co. v. Am. Surety Co.*, 313 Pa. 145, 149, 169 A. 226.

[10] See *Nice Ball Bearing Co. v. Mortgage B. & L. Assn.*, 310 Pa. 560, 166 A. 239; *Weinroth v. Homer B. & L. Assn.*, 310 Pa. 265, 271, 165 A. 28; *Ferrando v. U. S. Nat. B. & L.*, 307 Pa. 25, 160 A. 716; *Petry v. Harwood Electric Co.*, 280 Pa. 142, 124 A. 302; *Maxler v. Freeport Bank*, 275 Pa. 510, 119 A. 592; *Barnett v. Phila. Market Co.*, 218 Pa. 649, 67 A. 912; *Lauman v. Lebanon Valley R. R. Co.*, 30 Pa. 42; *Hall v. Greater Adelphi B. & L. Assn.*, 113 Pa. Superior Ct. 14, 171 A. 427.

[11] Judge LAMBERTON said: "We will next consider the status of a nonassenting stockholder with regard to those who were creditors of a constituent association. For the purpose of convenience

A number of appeals complain of the allowance, as general creditors' claims, of claims presented by dissenting or nonassenting shareholders of the constitutents. For the reason given we all agree the learned court below was right in allowing them to share *pari passu* with other general creditors.

Some of the seven constituent associations were indebted for money borrowed in circumstances which, if the constituent debtor had been liquidated, would have entitled such creditors to payment in the liquidation in preference to creditors holding obligations resulting from shareholding in the constituent.

The Nice Ball Bearing Company demanded payment of a judgment against the New corporation, affirmed by this court: 310 Pa. 560, 166 A. 239. The learned court below directed that it be paid with interest. The Receiver appeals at No. 334 from that order; it is also challenged by the appeals of four other parties: Samuel Huberman, trustee, No. 321, who claims as assignee of a dissenting stockholder of Hoover and of Academy, con-

---

we will assume that association A and association B merged and became association C. Prior to the merger, creditors of association A were entitled to payment ahead of stockholders of association A, out of the assets of that association, and creditors of association B were entitled to payment ahead of stockholders of association B out of the assets of that association, but creditors of association A were entitled to no payment out of assets of association B, either prior to, or on an equality with, or subsequent to stockholders of association B, and vice versa. Upon the merger, creditors of association A and association B became creditors of association C, and, therefore, entitled to priority in payment out of all of the assets of association C ahead of those stockholders of both A and B who assented to the merger and therefore became stockholders of association C. But at the moment of the merger, nonassenting stockholders of A and B likewise became creditors of C. The right of creditors of associations A and B to priority was unimpaired by the merger: *Weinroth v. Homer Bldg. & Loan Assn.* (supra) [310 Pa. 265]; *Sharps v. Homer Bldg. & Loan Assn.* (supra) [111 Pa. Superior Ct. 556] but was not increased thereby."

stituents; Northern Trust Company at No. 330 and Integrity Trust Company at No. 338, creditors for money loaned to constituents; Isaac Hassler, No. 337, claiming as a nonassenting shareholder. The Nice Ball Bearing Company obtained judgment for $40,044 in its action at law, brought as a shareholder not assenting to the merger, to recover the value of its stock in the constituent association. When the judgment was entered, the defendant, the New corporation, was solvent.

Part of the property in the receiver's possession is real estate, which is subject to the lien of claimant's judgment; part is in the proceeds of real property sold clear of the lien pursuant to section 719 of the Department of Banking Code of 1933, P. L. 565, 71 PS section 733-719, the proceeds taking the place of the land. On May 7, 1932, when the judgment was entered in court of Common Pleas No. 2, the New corporation appealed to this court and, to make the appeal a supersedeas, furnished the bond of Union Indemnity Company. The judgment was affirmed January 18, 1933, but was not paid because on January 6, 1933, the surety company went into liquidation. It appeared that, to obtain the surety bond, the New corporation had provided counter indemnity by depositing $45,000 of government bonds with Tradesmen's National Bank & Trust Company under a written arrangement "to secure the Union Indemnity Company . . . as Surety on our behalf on a certain Appeal Bond . . ." and also providing for the return of the bonds to the appellant if its appeal succeeded. After the appointment of receivers for the New corporation by the federal court in February, 1933, the Tradesmen's National Bank was ordered to deliver the bonds to the Receiver without prejudice to the rights of the Nice Ball Bearing Company; later the bonds were called for payment and others were substituted. The Nice Ball Bearing Company asked to have the bonds applied in payment of its claim and the learned court below followed

the general rule[12] that a "creditor is entitled to all the securities taken by the surety of his debtor, either for the purpose of securing the payment of the debt to the creditor, or for the purpose of indemnifying himself against the payment of it." Some objection was made to the allowance of interest, but the learned judge concluded: "Nice Ball Bearing Company has a judgment which under our law bears interest. By operation of law it secured a lien on certain assets of the New Mortgage Association. It is entitled to receive from the proceeds of those assets both principal and interest to date of payment."[13]

The arguments presented against the payment of this judgment out of the proceeds of the bonds and the real estate upon which it was a lien proceed on the ground that it is a nonassenting shareholder's judgment for the value of its shares against an insolvent corporation instead of against one that was solvent. The arguments cannot be accepted. The judgment was obtained against a solvent corporation. The receiver was appointed after the judgment was rendered and took the assets *cum onere*. In *Philadelphia Trust Company v. Northumberland County Traction Co.*, 258 Pa. 152, 172, 101 A. 970, this court said: "The effect of the receivership was to place the property of the merged company in the hands of the receivers to be administered for the benefit of the insolvent corporation. It did not and could not affect or impair the liens or contractual rights of the creditors of the merged company or of any of the constituent companies: *Galey v. Guffey,* 248 Pa. 523. A receiver of the insolvent corporation stands in the shoes of the

---

[12] *Cornwell's Appeal,* 7 W. & S. 305; *Kramer & Rahm's Appeal,* 37 Pa. 71; *Rice's Appeal,* 79 Pa. 168; *Seaton's Estate,* 328 Pa. 276, 195 A. 43.

[13] Sec. 2, 1 Sm. L. 7, 12 PS section 782; *Watson v. McManus,* 223 Pa. 583, 72 A. 1066; *American I. & S. Co. v. Seaboard A. Ry.,* 233 U. S. 261.

owner and takes only his interest in the property sub-
ject to all valid liens against it. He can acquire no
other greater or better interest than the debtor had in
the property, and to this extent the receiver has been
held to stand in the shoes of the debtor; and he has the
same right which the insolvent would have had, and can
set up no rights against claims which the debtor could
not have set up: 34 Cyc. 191, and cases cited. The ap-
pointment of a receiver for property does not affect pre-
existing liens upon the property, or vested rights or in-
terests of third persons therein. A receiver, it is held,
succeeds only to such right, title and interest in the
property as the individual or corporation for which he
is appointed receiver had at the time the appointment
was made: . . ."

One appellant puts an objection in this form: "Since
its [the judgment creditor's] status is simply that of a
dissenting shareholder, did it obtain any better position
by the action it brought against the merged Association
and the judgment which it obtained?" Argument is also
made that it is inequitable to allow a dissenting share-
holder with judgment against the merged corporation
for the value of his share, to take on a parity with one
who was a creditor of the constituent association for
money loaned. We think that when the facts are exam-
ined there is no basis for the inference that it is inequi-
table. If, for example, the New corporation had paid
all its debts except this dissenting stockholder's judg-
ment and had then borrowed money from one of the ap-
pellant trust companies and, thereafter, had failed with
these two creditors unpaid, no one would suggest that
the subsequently loaning creditor should take priority
in distribution over the judgment creditor, merely be-
cause the judgment represented the value of a dissen-
tient's stock interest in a constituent; yet that is what
the argument comes to. The association was solvent at
the time of the merger. Presumably, every creditor for
money loaned could then have obtained his money; he

could have reduced his claim to judgment and have obtained his lien. Such creditors, we must assume, knew of the merger and had available means of knowing that some stockholders dissented. The creditors knew that the merged association must assume the obligation of paying the value of the dissenters' shares and that, as the priority which the money loaning creditor had over a shareholder applied only in the constituent corporation, there would be no priority over such creditors if the merged corporation went into liquidation. The judgment creditor never was a shareholder in the New corporation. The assets of the constituent of which the Nice Ball Bearing Company had been a stockholder were transferred to the New corporation. The shareholder could not prevent the transfer; all that it could ultimately require was that the transferee should pay him the value of his interest. In the light of such considerations, the result cannot be considered inequitable. Referring to such transfers of assets, the statute, Act of 1909, P. L. 408, as amended, 15 PS section 423, in section 3, imposes a provision that "all rights of creditors and all liens upon the property of each of said corporations shall continue unimpaired, limited in lien to the property affected by such liens at the time of the creation of the same, and the respective constituent corporations may be deemed to be in existence to preserve the same; and all debts not of record, duties, and liabilities of each of said constituent corporations shall thenceforth attach to the said new corporation, and may be enforced against it to the same extent and by the process as if said debts, duties, and liabilities had been contracted by it."

Some of the New corporation's creditors for money loaned never sustained any relation to the constituent of which Nice Ball Bearing Company had been a shareholder, and therefore could not come into competition with it for priority until after the merger. It is obvious that if an amply solvent corporation merged with one having no surplus that the latter's creditors would be in

much better position as the result of the contribution of the solvent corporation's assets than they would have been without the merger. These considerations led to discussion in some of the arguments of what the parties called "tracing" the assets of the constituents. Some of the appellants contend that the term is applicable only to the pursuit of property wrongfully diverted for the purpose of reclaiming or recapturing on the theory of a constructive trust. Here there was no wrongful diversion; no one suggests that the merger was not lawful. On the other hand it was suggested that all that was meant by the term was to describe the pursuit of assets from the constituent into the merged corporation for the purpose of applying the provision quoted above "that all rights of creditors and all liens upon the property of each of said corporations shall continue unimpaired. . . ." As the court based no priority on "tracing," it is not necessary now to discuss it; the subject may be left until presented with relation to controlling facts.[14]

The claims of Integrity Trust Company, Northern Trust Company and Columbia Avenue Building Association for money loaned were allowed as general creditors[15] with interest to the date of the appointment of receivers by the federal court; these creditors complain because they were not given priority of payment over the claim of the judgment creditor, Nice Ball Bearing Company, and over the claims of dissenting and nonassenting shareholders of constituents. As we have already said such shareholders of constituent associations become, by the legal effect of the merger, creditors of the New corporation with the same creditors' claim on its assets enjoyed by general creditors of the corporation. Counsel for the

---

[14] Compare *Merwine v. Mt. Pocono Light & Improvement Co.,* 304 Pa. 517, 156 A. 150; *Halpern v. Grabosky,* 296 Pa. 108, 145 A. 834; *Berkovitz's Appeal,* 319 Pa. 397, 179 A. 746.

[15] Appellants at Nos. 338, 330, 192, 359.

Northern Trust Company, in support of a contrary view, refers to the last paragraph of the opinion in *Glenwood-Progressive Building and Loan Association Case,* 129 Pa. Superior Ct. 249, 257, 195 A. 766. As that case was presented, it appears that stockholders in Balkan Building & Loan Association gave withdrawal notices but before payment could be obtained the Balkan · Association merged with another. The merged association failed and when the receiver's account came on for audit the withdrawing stockholders of the Balkan association made a claim. The common pleas held that "they were preferred to shareholders of the merged association and entitled to share pari passu with the general creditors." From that holding an appeal was taken and the judgment was affirmed in the Superior Court. We think the decision was correct. *Hall v. Greater Adelphi B. & L. Association,* 113 Pa. Superior Ct. 14, 171 A. 427, is also cited as sustaining the argument, but, again, an examination of the decision shows that it does not. Judgment was entered for want of a sufficient affidavit of defense in an action against the new corporation by a dissenting shareholder of a constituent to recover the value of his stock. The plaintiff of course had never been a shareholder in the new corporation. By taking over the property of the constituents, the merged association necessarily assumed the obligation of paying to the dissenting plaintiff the value of his property. Nothing that was said about the right of the court to control execution on its judgment (a power not depending upon the nature of building associations, see *S. F. Com. v. Phila.,* 324 Pa. 129, 135, 188 A. 314, and cases there cited) changed the fact that the plaintiff was a general creditor of the merged or new association.

On behalf of Columbia Avenue Building Association, an additional contention was made that it had traced assets of Handel, of which it had been a general creditor, into the treasury of the New corporation, and that claim-

ant was entitled to payment out of those assets. The difficulty with the contention is that the proof failed.[16]

Samuel Huberman, appellant at No. 321, is the assignee of Francis M. McAdams, a shareholder in the constituents Hoover and Academy. His claim was allowed as a general creditor with interest to the date of the federal receivership. He voted against the merger and, learning that a majority of the shareholders had voted to merge, demanded payment of the value of his shares and, on April 1st, filed his bill to enjoin the merger until payment was made, etc. Notwithstanding the suit, a charter was granted to the merged corporation April 7, 1931. A week later, on his application, a preliminary injunction was granted restraining the constituents from transferring books and property and directing them to keep their records intact until final hearing.

It is fundamental that if the shareholders of two corporations propose to comply with the Merger Act, a dissenting shareholder may enjoin the merger until he receives the value of his stock or is otherwise satisfied with regard to it, and that, if he permits the merger to take place without so protecting his rights, he is thereafter limited to his action against the new corporation for the value of his stock in the old. It is noteworthy that Mr. McAdams's bill was filed against the seven constituent associations before the charter for the merged association was granted. The preliminary injunction is dated April 21, 1931. It was not until April 22, 1931, when Mr. Joseph H. Sundheim entered his appearance for the New association reciting that its charter had been granted on April 7th, that the New corporation became a party. On that date counsel for all parties signed a stipulation providing that upon the New corporation's giving its bond in the sum of $25,000 "conditioned for the payment to the plaintiff of any sum or sums that

---

[16] See Judge LAMBERTON's adjudication, pp. 1014a to 1018a, a passage too long to be quoted here.

may be found to be due the plaintiff from the Academy Building and Loan Association or the Hoover Building and Loan Association, or any of the other Associations defendants, including Mortgage Building and Loan Association, created by Letters Patent, dated April 7, 1931, . . ." the preliminary injunction should be vacated. The bond was filed and the court vacated the injunction; in this way the bar to the merger was removed.[17] Thereafter the suit came on for hearing pursuant to the stipulation, and in February, 1932, the parties fixed the value of the stock at $15,638.25, for payment of which the New corporation then gave its bond, with the option of paying in monthly installments and with a provision that on any default in payment a decree should be entered for such deficit as then remained. Installments were paid until the time of the federal receivership, February, 1933; no judgment was entered for default, we assume, because the appointment of the receiver fixed the rights of the parties to the insolvent estate.

Huberman, the assignee, offered evidence identifying assets of the New corporation as assets that had been transferred by Hoover and by Academy. The learned judge ruled that claimant was not entitled to priority out of the assets of these constituents. This was undoubtedly correct. Claimant could have enjoined the merger until the value of his shares was paid or secured; his injunction, which was the only bar to merger, he surrendered voluntarily; he could not by stipulation obtain and preserve, against the world, a lien or claim on the assets transferred by the merger to the New corporation. It was the New corporation that was obligated by law, as well as by its contract, to pay him the value of his shares after he permitted the merger to go on instead of first requiring payment.

Mr. Isaac Hassler, appellant at No. 337, presents considerations which have been passed upon above, but, in

---

[17] Compare *Maxler v. Freeport Bank,* 275 Pa. 510, 119 A. 592.

addition, presents two questions not common to the other appeals. These questions, he states as follows: "4. If an attorney to whom such Association is indebted for legal services discovers just before the Audit fraud practiced upon him, should not the Court allow filing claim nunc pro tunc?" "5. If the Banking Department does not perform but devolves a substantial portion of the work upon an attorney, ought he not be allowed reasonable compensation for the extraordinary services directly and specially protecting the estate?"

Mr. Hassler appeared for himself, Max Abramovitz (appeal No. 382) and Lillian D. Bernheimer (appeal No. 380), nonassenting shareholders. After the time for filing objections to the First and Partial Account had passed (section 1002, Department of Banking Code, 1933, P. L. 565) Mr. Hassler asked leave to file a claim nunc pro tunc for $170.00 "the balance for professional services of $750 performed for the Old Mortgage Association. . . ." He also contended that, though appearing for himself and the other two clients mentioned, he was entitled to the allowance of counsel fee "for services of unusual and special necessity and fundamental importance thrown upon the appellant . . . and which were a benefit to all interested in the estate." The learned court below considered his claims in the light of the evidence and, in rejecting them, said: "But there is not one scintilla of evidence of fraud or misconduct on the part of the Secretary of Banking or anyone acting on his behalf. For this reason Mr. Hassler's petition for leave to file his Proof of Claim nunc pro tunc was discharged.

"On January 25, 1938, Isaac Hassler filed his petition asking for an allowance of counsel fee to be paid to him out of the estate on account of services in preserving and protecting the assets of the estate and preserving distribution to those properly entitled thereto. This petition was refused because, in the opinion of the court, Mr. Hassler rendered no services in this matter other than

those on behalf of the three claimants whom he repre-
sented, namely, Isaac Hassler, Max Abramovitz, and
Lillian M. Bernheimer." We have been furnished with
no reason to differ from those conclusions: compare
*Com. v. Order of Solon,* 193 Pa. 240, 44 A. 327; *Harri-
son's Estate,* 221 Pa. 508, 70 A. 827; *Evans v. Diamond
Alkali Co.,* 315 Pa. 335, 172 A. 678.

The appeal at No. 255 is by Ralph M. Selig, who com-
plains that he was not held to be a general creditor in
virtue of having declined to assent to the merger. The
evidence is meager. It appears that Mr. Selig was a
shareholder in four of the constituents, Dannenberg,
Realty, Academy and Hoover, holding nine books on
which dues had been paid in the sum of $3,622.50. The
merger value was $2,623. He contends that he did not
assent to the merger, but the fact is that subsequent to
the merger he made payments on shares represented by
four of the books and then gave notice to the New cor-
poration that he desired the withdrawal value. The wit-
ness who testified about Mr. Selig's shares, after men-
tioning the nine books and the constituents which issued
them, was asked this question—"Q. Was a notice of
withdrawal given on these books? A. Yes. Q. When
was the date? A. There was a notice of withdrawal
given on all books as of May 31, 1932." The merger, it
will be recalled, occurred April 7, 1931. In the account
of the Secretary, Mr. Selig was treated as a stockholder
in the New corporation. The learned court held: "A
notice of withdrawal sent to the new association after
the merger, if sent knowingly, is a recognition of owner-
ship of shares in the New association, and is, therefore,
inconsistent with a claim as a nonassenting stockholder.
In this case we are of the opinion that the payment of
dues on some shares after the merger, plus the notice of
withdrawal of all shares after the merger, effectually
estops claimant from asserting that he is a nonassenting
stockholder as to any of his shares. Claimant is en-

titled merely to a stockholder's status." That conclusion is affirmed.

At No. 335, the receiver appeals from the allowance of the claim of Fidelity-Philadelphia Trust Company, Trustee. The Trust Company held a mortgage on property owned by Hoover from December, 1927, to December 29, 1930. On June 16, 1930, claimant and Hoover made an extension agreement by which Hoover guaranteed the payment of principal, interest, taxes and fire insurance. On default, foreclosure proceedings were begun, damages were assessed at $6,241.27 and at the foreclosure sale claimant bought the property for $50.00, the deed being acknowledged and recorded January 26, 1933. Claimant was required to pay the taxes for three years aggregating $692.01. The receiver declined to allow the claim unless claimant allowed credit for the value of the property in excess of the $50.00 bid at the sheriff's sale. It will be observed that all this occurred before there was any proceeding in insolvency. The learned court below was therefore right in allowing the claim for the reasons recently stated in *Emlen's Estate,* 333 Pa. 238, and *All Wyoming Building & Loan Association Case,* 333 Pa. 250, but the sum of $275 allowed for counsel fees must be deducted as not included within the terms of the extension agreement: *All Wyoming Building & Loan Association Case,* 333 Pa. 250.

The receiver also appeals to No. 333 from the allowance as an administration expense, of the Philadelphia Savings Fund Society's claim for reimbursement of taxes paid for 1935 and 1936 on premises 1219-27 Filbert Street, Philadelphia. Claimant held a mortgage on the Philadelphia Windsor Hotel property and, as mortgagee, in April, 1935, took charge, conducted the hotel, collected the rents, etc., vacating the property December 15, 1936. The receiver's contention, briefly stated, is that, as the mortgagee was in possession pursuant to the terms of the mortgage, it ought to pay the taxes. The title was in the receiver. He had the option of abandoning the

property but preferred to hold it, and his brief concedes liability. He says: "By reason of his failure to abandon the property in an endeavor to protect an apparent equity the receiver became liable for the payment of the taxes assessed after the receivership, but this liability does not become an administrative expense until it is shown that he was administering the property." While the claimant was exercising rights under the mortgage it was nevertheless also acting in the interest of the receiver; the protection of the "apparent equity" for the receiver's estate—a part of his administrative obligation—was obtained by the mortgagee's carrying on the business on the premises; the property, with the hotel in operation, was of greater value than an idle plant. See *Gehr v. Iron Co.*, 174 Pa. 430, 34 A. 638; *Penna. Engineering Works v. New Castle Stamping Co.*, 259 Pa. 378, 103 A. 215.

The claims of creditors were allowed with interest to February 9, 1933, the date on which receivers were appointed by the United States District Court. The claims of the nonassenting stockholders, which became payable as of the date of the merger, carried interest from April 7, 1931, the date of the merger. As to interest accruing thereafter Judge LAMBERTON said: "In regard to interest accruing after the receivership, the question is more difficult. There are many decisions which hold that interest ceases when the receiver is appointed. But the prevailing rule appears to be that this is a rule of convenience to be adopted only in the case of insolvent estates, and that where the estate turns out to be in fact solvent, interest is allowed on all claims until the date of payment. This is nowhere better stated than in *American I. & S. Mfg. Co. v. Seaboard A. L. R. Co.* [233 U. S. 261], where the following language is used: 'As a general rule, after property of an insolvent is in *custodia legis* interest thereafter accruing is not allowed on debts payable out of the fund realized by a sale of the property. But that is not because the claims had lost their

interest-bearing quality during that period, but is a necessary and enforced rule of distribution, due to the fact that in case of receiverships the assets are generally insufficient to pay debts in full. If all claims were of equal dignity and all bore the same rate of interest, from the date of the receivership to the date of final distribution, it would be immaterial whether the dividend was calculated on the basis of the principal alone or of principal and interest combined. . . . For that and like reasons, in case funds are not sufficient to pay claims of equal dignity, the distribution is made only on the basis of the principal of the debt. But that rule did not prevent the running of interest during the receivership; and, if, as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid.' And again: 'Principal as well as interest, accruing during a receivership, is paid on debts of the highest dignity, even though what remains is not sufficient to pay claims of a lower rank in full.' See also *Jamison's Estate, Boyer's Appeal* (supra) [163 Pa. 143]; *McGinnis v. Finance Co.,* 8 F. (2d) 532; *Thomas v. Western Car Co.,* 149 U. S. 95; *Johnson v. Norris,* 190 Fed. 459; *Gamble v. Wimberly,* 44 F. (2d) 329; *Pa. Steel Co. v. N. Y. City Ry. Co.,* 216 Fed. 458; *Fulton's Estate* (supra) [65 Pa. Superior Ct. 437]; 23 Ruling Case Law, page 104; Clark on Receivers (2nd ed.), para. 660(a). That interest does not *ipso facto* cease upon the appointment of a receiver is also shown by the following Pennsylvania cases: *Scott v. Morris,* 9 S. & R. 123; *Shultz's Appeal,* 11 S. & R. 182; *Estate of the Bank of Penna.* (supra) [60 Pa. 47]. . . .

"An application of this doctrine to the instant case would indicate that all creditors should receive interest to the date of payment of their claims before anything is paid to assenting stockholders, but we need not so decide at this time. Apparently the estate of the New Mortgage Association is insolvent. Therefore as to creditors in general, the rule of convenience will be adopted

and interest will be allowed at this time only to the date of the receivership. If and when these claims are discharged in full we will determine the distribution of any surplus there may be." We see no reason to differ from the conclusion reached by the learned judge.

In the case of each appeal, therefore, an order will be made that the judgment appealed from is affirmed, except that in No. 335, claim of Fidelity-Philadelphia Trust Company, Trustee, the affirmance is subject to the deduction in the sum of $275 counsel fees. Costs shall be paid out of the fund.